RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0308p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AUSTIN CHRISTIAN GRIFFITH,

          *Plaintiff-Appellant/Cross-Appellee*,

    *v.*

FRANKLIN COUNTY, KENTUCKY and HUSTON WELLS, MICHAEL TURNER, FRED GOINS, DON STURGEON, SCOTTY TRACY, MARTI BOOTH, LAMBERT MOORE, and RICK ROGERS, in their individual capacities (19-5378 & 19-5439); SOUTHERN HEALTH PARTNERS, INC. and RONALD WALDRIDGE, MD, JANE BARTRAM, APRN, HEATHER SHERROW, RN, and SABINA TREVETTE, LPN, in their individual capacities (19-5378 & 19-5440); BRITTANY MUNDINE, RN, in her individual capacity (19-5378 & 19-5438),

          *Defendants-Appellees/Cross-Appellants*.

Nos. 19-5378/5438/5439/5440

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:16-cv-00077—Gregory F. Van Tatenhove, District Judge.

Argued: January 28, 2020

Decided and Filed: September 21, 2020

Before: MERRITT, CLAY, and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellant/Cross-Appellee. D. Barry Stilz, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Franklin County, Kentucky Appellees/Cross-Appellants. Robert A. Ott, REMINGER, CO., L.P.A., Louisville, Kentucky, for Southern Health Partners Appellees/Cross-Appellants. Margaret Jane Brannon, JACKSON KELLY PLLC, Lexington, Kentucky, for Appellee/Cross-Appellant Mundine. **ON BRIEF:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky, for Appellant/Cross-Appellee. D. Barry Stilz,

KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Franklin County, Kentucky Appellees/Cross-Appellants.  Robert A. Ott, REMINGER, CO., L.P.A., Louisville, Kentucky, for Southern Health Partners Appellees/Cross-Appellants.  Margaret Jane Brannon, Robert F. Duncan, JACKSON KELLY PLLC, Lexington, Kentucky, for Appellee/Cross-Appellant Mundine.

BUSH, J., delivered the opinion of the court in which MERRITT, J., joined, and CLAY, J., joined in part.  CLAY, J. (pp. 39–55), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

JOHN K. BUSH, Circuit Judge.  This case involves a tragic turn of events during Austin Griffith's pretrial detention at Franklin County Regional Jail ("FCRJ").  Griffith was arrested on November 8, 2015 after a failed robbery attempt, and he suffered a series of seizures six days into his detention.  He was sent to a local hospital, where he suffered a third seizure, and was then airlifted to University of Kentucky Hospital.  He later recovered but continues to suffer headaches and other negative symptoms in the wake of this medical event.

Griffith brought suit under 42 U.S.C. § 1983 alleging that he received unconstitutionally inadequate medical care during his detention.  His claims were against Franklin County, the county judge executive, the jailer and members of the Franklin County Fiscal Court (collectively, the "Franklin County Defendants"), as well as against Southern Health Partners, Inc. ("SHP"), a private medical company that provides medical services at the jail, and certain medical staff of SHP (collectively, the "SHP Defendants").  In addition to his constitutional claims, the complaint alleged state-law claims.

The district court granted summary judgment to Defendants on the constitutional claims, finding that Griffith failed to establish that Defendants acted with deliberate indifference to his serious medical needs.  The district court then declined to exercise supplemental jurisdiction over the state-law claims.  Griffith appeals the grant of summary judgment.  For the reasons that follow, we **AFFIRM** the district court's judgment.

## I. Background

### A.     Investigation and Arrest

Austin Griffith was arrested on November 8, 2015 for robbery and assault after he and two other individuals unsuccessfully attempted to rob a third party with a baseball bat. The intended victim was able to rebuff the attack, however. During the scuffle Griffith was struck in the back with the bat, and he began vomiting. Griffith and his friends fled the scene, but witnesses had identified the vehicle, which was registered to Griffith's mother. Law enforcement contacted Griffith's mother, and she in turn called Griffith and instructed him to return home to speak with the police. Griffith complied. Griffith was still vomiting when he returned home and remained unwell during a two-hour meeting with law enforcement. Griffith was arrested and brought to FCRJ, where, at 10:41 p.m., he was admitted and charged with assault and burglary.

Griffith remained nauseated during intake procedures. At his deposition, Griffith testified that he had been vomiting because of nerves, given that he had "never been in legal trouble." Austin Griffith Dep., R. 74-1 at PageID 1174–75. He was emotional when he arrived at the jail and began crying while on the phone with his mother. Griffith received a standard medical interview from Deputy Jailer Jessica Jenkins and filled out a medical questionnaire in which he indicated that he "smokes marijuana a few times everyday" and that he had taken four Xanax around 1 p.m. that day. Standard Medical Questions Form, R. 69-8 at PageID 773. Deputy Jenkins believed that Griffith demonstrated a potential for alcohol or drug withdrawal and accordingly recommended a referral for medical evaluation by the jail's nursing staff. Deputy Jenkins also identified Griffith as a moderate suicide risk. She classified him as a moderate risk for forty-eight hours to "monitor [his] stability and give [him] time to be clean from substances." KJMHCN Episode Report, R. 71-5 at PageID 940. Griffith acknowledged during this interview that he understood that he could request a health care provider at any time.

Deputy Jenkins discussed Griffith's mental health status with clinician Kelley Ford at the Kentucky Jail Mental Health Crisis Network to determine Griffith's pertinent risk level. Ford conducted a telephonic observation and recommended that FCRJ place Griffith on moderate

observation for forty-eight hours.  The Incident Report indicated that he was designated for observation because of the "seriousness of his charges and his emotional behavior while making his phone call [with his mother]."  Incident Report, R. 69-10, PageID 776.  The order from the Kentucky Jail Mental Health Crisis Network to conduct this monitoring did not indicate that he was being held for observation because of potential drug withdrawal.

### B.     Detox Cell

Griffith was placed in a "detox" cell at 11:10 p.m. so he could be monitored for the first forty-eight hours of his detention.  During this time,  FCRJ deputy jailers checked on his condition approximately every twenty minutes, and observed Griffith vomiting seven times between the time he was placed in the detox cell and 9 a.m. the next morning, when he was first seen by medical staff.  The deputy jailers testified that this amount of vomiting was not uncommon for an inmate in detox.  The deputy jailers recorded these observations in Griffith's observation log.

As indicated, Griffith had also been referred to the jail medical staff to be screened for potential medical observation.  FCRJ provides medical care by contracting with SHP.  The SHP medical staff at FCRJ falls into three general categories: a Medical Director, Dr. Robert Waldridge; two Advanced Practice Registered Nurses ("APRNs"); and three nurses, two of whom were Licensed Practical Nurses ("LPNs") and one of whom was a Registered Nurse ("RN").

As Medical Director, Dr. Waldridge oversaw healthcare services at the jail during the operative time period.  SHP's original contract required Dr. Waldridge to conduct weekly visits to the jail, but he ultimately delegated this duty to APRNs Jane Bartram and Stacy Jensen.  Dr. Waldridge remained available for telephone consultation.  APRNs Bartram and Jensen therefore visited the facility once per week on a rotating basis, during which time they signed off on medical charts and visited specific inmates who were identified by the daily nursing staff as requiring additional care.  Inmates who needed further attention from an APRN would be designated on a weekly list by the daily nursing staff.

The nursing staff in turn provided daily care. During the work week, LPN Sabina Trivette and RN Heather Sherrow[1] provided a combined sixteen hours of medical coverage per day. Weekend care was provided by RN Brittany Mundine, who worked six hours on both Saturdays and Sundays. Because RNs and LPNs cannot make diagnostic or treatment decisions, SHP employs policies and protocols to guide the nurses' daily operations. Many of these policies and protocols require approval of an APRN or physician before an RN or LPN can take a specific course of action; for example, the FCRJ's protocol for "intoxication and withdrawal" requires that a nurse call a physician or an APRN before the protocol is initiated. RNs and LPNs thus have various options to respond to medical situations. They can provide treatment that is within their standard of care (such as providing over-the-counter medication in certain circumstances), place the patient on the weekly list (so the patient will be seen by an APRN on the next visit), call an APRN to receive immediate guidance or initiate a certain protocol, or directly send the patient to the hospital for emergency care. RN Sherrow and LPN Trivette testified that they took the latter three steps with some regularity.

Griffith first interacted with SHP medical staff at 7:42 a.m. on Monday, November 9th—after being in the facility for approximately eight hours—when Sherrow conducted a medical screening. Sherrow testified that she checked on him at this time because of his Kentucky Jail Mental Health Crisis Network designation as a moderate suicide risk.[2] Sherrow met with Griffith while he was on his way to "pre-trial" and completed a Suicide Prevention Screening Guidelines Form. Sherrow indicated that Griffith was no longer showing signs of depression, did not appear overly anxious, and was otherwise behaving normally. She also indicated that he was experiencing nausea and vomiting. There is no indication that Sherrow did anything at this time to address his nausea or take his vital signs. The form cross-referenced the observation log recorded by the deputy officers indicating that Griffith had been vomiting regularly throughout the night, but RN Sherrow testified that she never reviewed the observation log herself.

---

[1]The Franklin County Defendants refer to Sherrow as an LPN, but cite a deposition by Jailer Rodgers, who indicated that she was actually an RN. Sherrow also testified that she is an RN.

[2]Similarly, RN Sherrow indicated on the form that Griffith had been placed on suicide watch by Kelly Ford because of "charge related risk." Suicide Preventions Guidelines Form, R. 69-19 at PageID 813.

After returning from pre-trial, Griffith completed a medical request form, referred to as a "sick call slip," wherein he complained of stomach issues and vomiting. Trivette met with Griffith at approximately 10:00 a.m. to conduct his medical intake screening and to respond to his sick call slip. Trivette took Griffith's vital signs and conducted a medical observation. Trivette stated that Griffith had reported vomiting and diarrhea, that she reviewed his hydration, and that his skin was warm, dry, "race appropriate & [that it had] good turgor," Medical Staff Receiving Screening Form, R. 69-21 at PageID 815. To address Griffith's reports of vomiting and diarrhea, Trivette provided Imodium and Mylanta. Griffith also indicated that he was not able to urinate, so Trivette put him on a list to provide a urine sample the following day. Trivette also indicated that Griffith reported some drug use—marijuana daily and Xanax on weekends—but further marked that he did not appear to be under the influence of or withdrawing from drugs or alcohol.

Later Monday afternoon, LPN Trivette again observed Griffith when he came for medicine and recorded her observations on Griffith's Suicide Prevention Form. At no time on Monday did any nurse attempt to identify the source of Griffith's vomiting, determine the amount of the vomiting, or designate Griffith to be seen by an APRN.

Because Trivette did not believe Griffith was experiencing significant drug withdrawals, she did not initiate the SHP drug withdrawal protocol, which would have required ongoing medical observation. The FCRJ staff continued to observe Griffith every twenty minutes pursuant to its own designation of him as a moderate risk, but those observation logs were never reviewed by Sherrow or Trivette. Deputy jailers also observed Griffith throwing up six times between his last medical evaluation on Monday afternoon and 5:00 a.m. Tuesday morning, when he filled out a second sick slip. Within that window, he did not eat any lunch and ate only 30% of his dinner.

Griffith's second sick slip—which he filled out, as mentioned above, on Tuesday, September 10th—contained complaints about his nausea. Trivette responded to the complaint and observed that he had warm and dry skin, a steady gait, soft abdomen, and good skin turgor. She also reported that she reviewed Griffith's hydration and that Griffith mentioned he was again

unable to urinate.  Because of his continued complaints of vomiting and diarrhea, LPN Trivette requested that Griffith be moved to a dry cell to further observe those symptoms.**[3]**  However, this move never occurred because no dry cells were available.

Griffith was also seen on Tuesday by Sherrow at 7:50 a.m. and Trivette at 3:30 p.m. so the nurses could provide him medicine.  Some time, on either Tuesday or Wednesday, Griffith's mother attempted to visit him but was denied because she was told he was still in detox.  Griffith was observed vomiting two more times that evening.

On Wednesday, November 11th, Griffith was again seen by Sherrow and Trivette, and they performed the urinalysis that had been ordered the day before.  Griffith was still complaining of vomiting, and Trivette provided him some Gatorade.  Sherrow performed the urine dip test and observed that his urine contained an abnormal amount of blood and protein.  According to Griffith's liability expert, Madeline LaMarre, the volume of blood and protein in the sample were signs that he had an acute kidney injury, and the standard of care required that he be hospitalized.  Sherrow did not send Griffith to the hospital, but instead added him to the list to be seen by an APRN on the next weekly visit.  Trivette testified that this approach was taken because she and Sherrow "weren't that alarmed by [their] evaluation [of the urine dip test], but [they] did want it reviewed."  Trivette Dep., R. 75-7 at PageID 2316.

The urine sample was also a cloudy yellow, which Trivette thought could indicate the beginning of an infection.  Consequently, Trivette prescribed an antibiotic Cipro, even though neither Sherrow nor Trivette was authorized to prescribe medicine without approval by an APRN or a physician.  According to Griffith, prescribing Cipro before notifying an APRN was a violation of the nurses' scope of care.

Wednesday was also the end of Griffith's forty-eight-hour monitoring period. He was therefore reevaluated by the Kentucky Jail Mental Health Crisis Network on that day.  Griffith was downgraded from "moderate" to "low" risk, and he was recommended for release from observation into general population.  The reevaluation form indicated that Griffith did not

---

**[3]**A dry cell is a cell in which the plumbing has been cut off.  This allows prison officials and medical staff to observe bodily discharge.

present a risk for drug withdrawal, but that jail staff reported he was going through detox and was on detox observation. Griffith was then moved to a general population cell at 4:19 p.m. on Wednesday, with "out of detox" given as the reason.

### C.     General Population

The parties' accounts of the next three days vary significantly. There is very little documentation of what transpired during this time because Griffith was no longer under observation by FCRJ staff and because he did not fill out any sick slips after being transferred to general population.

According to Defendants, November 11th–13th were uneventful. During that period, Griffith also drank water, purchased and consumed snacks from the canteen, and did not complete any sick call slips. Griffith does not dispute this, but states that he remained extremely ill and was pale, sweating, and vomiting constantly in his cell. Two of his cellmates, Stephen Fowler and Eugene Franklin, testified that they attempted to alert the guards to Griffith's medical condition by knocking on the cell window, but that the guards responded that they would remove Fowler's and Franklin's TV privileges if they did not stop banging on the glass. Franklin further testified that one of the guards, Officer Webb, ultimately responded to the prisoners' requests for help by telling them that Griffith had "been checked out" and that he was "fine." Franklin Dep., R. 74-4 at PageID 1429. There is no evidence that Webb or any deputy jailer conveyed the cellmates' concerns to medical staff.

At 3:00 p.m. on Saturday, November 14th, Griffith suffered a seizure while on the top bunk in his cell, causing him to strike his head on the wall and metal bunk. A cellmate alerted Deputy Kristyn Drake to Griffith's condition, and Deputy Drake radioed for LPN Mundine to provide medical assistance. Griffith was purple in the face and breathing erratically, but began to stabilize while waiting for Mundine to arrive. Mundine observed that Griffith had no visible head injury, and Griffith denied that he was in any pain or that he had a history of seizures. Griffith was escorted to booking for further examination.

Mundine called Sherrow to report the incident, and Sherrow advised Mundine to treat Griffith for temperature, have him moved to the bottom bunk, monitor him, and complete a urine

test for drugs.  Mundine tested him for drugs, which came back positive for THC only.  Griffith reported that he had been vomiting for days, so Mundine gave him Gatorade and prescribed an anti-nausea drug, Phenergan.  Mundine provided this prescription without first contacting an APRN, which, according to Griffith, was inconsistent with SHP's protocol and outside Mundine's scope of practice.  Nurse Mundine did not notify a doctor or an APRN about Griffith's seizure.

After Griffith stabilized, he asked to return to his cell rather than stay in booking.  Although Mundine had planned to keep him in booking while she completed her medical pass, she complied with his request and returned him to his cell with orders that he be moved to the bottom bunk. Mundine completed her rounds as planned and returned to continue reading Griffith's charts.  She then learned about his ongoing medical problems from the preceding days.

At 5:40 p.m., after being returned to his cell but before Mundine completed her review of his files, Griffith experienced a second seizure.  Mundine again responded, and she found Griffith in a similar condition as after his first seizure—blue skin, erratic breathing, dilated pupils, and mild disorientation.  Mundine then sent Griffith to the local emergency room at Franklin Regional Medical Center for observation and treatment.  Sherrow was initially unhappy with Mundine for hospitalizing Griffith without first consulting with her, but she later acknowledged that Mundine did the right thing.

After being admitted to the local emergency room, Griffith was diagnosed with acute renal failure.  The medical records from the emergency room are unclear about the cause of the initial illness and vomiting, the cause of the renal failure, and the cause of the seizures.[4]  His discharge paperwork form states: "[Griffith's] presentation is complex.  Differential [diagnosis] is broad."  FRMC Physician Record, R. 101-18 at PageID 3892.  It then discusses potential causes for his renal failure and seizures (including rhabdomyolysis, HUS, toxic ingestion, serotonin syndrome, encephalitis, or meningitis) but does not reach any resolution.

---

[4]None of Griffith's medical records indicate that he informed medical staff that he had begun vomiting after he was struck in the lower back by a baseball during the attempted robbery.

Griffith suffered a third seizure at the local emergency room, and was airlifted to University of Kentucky Hospital, where he received treatment and remained until November 22nd with diagnoses of acute renal failure, seizure disorder, posterior reversible encephalopathy syndrome ("PRES"), hypomagnesemia, and anion gap metabolic acidosis. His discharge paperwork states that the seizure was "[m]ost likely due to PRES," which was in turn caused either by "his acute renal failure or possibly intoxication." UK Discharge Summary, R. 69-33 at PageID 830. There is no other medical evidence about the cause of his seizure.

Griffith recovered from the incident but continues to suffer headaches, sleep deprivation, and an increased vulnerability to kidney failure.

**D.      Procedural History**

Griffith filed suit on October 3, 2016 asserting claims for deliberate indifference under the Eighth and Fourteenth Amendments, negligence and gross negligence under Kentucky law, and violations of Kentucky Revised Statutes § 441.045(3). The parties conducted discovery, and each Defendant moved for summary judgment on all claims.

After the parties finished their initial briefing, the district court ordered supplemental briefing on whether, in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), conditions-of-confinement claims brought under the Fourteenth Amendment should be analyzed using an objective standard. The parties complied.

The district court then granted summary judgment to all Defendants. It held that although the Sixth Circuit historically used the same inquiry to decide medical-care claims brought by pretrial detainees as it did to decide medical-care claims brought by convicted prisoners, *Kingsley* now mandated a more objective inquiry for claims brought by the former category of plaintiffs. *Griffith v. Franklin County*, No. 3:16-cv-00077-GFVT-EBA, 2019 WL 1387691, at *3–5 (E.D. Ky. Mar. 27, 2019).

The court then considered Griffith's claims. It found that the first prong of the relevant inquiry was satisfied. *Id.* at *6. And then granted summary judgment in favor of the SHP Defendants because Griffith (1) failed to demonstrate that his medical care was so insignificant

that it demonstrated deliberate indifference by medical staff; (2) failed to adequately advocate for himself when in general population because he did not submit any medical slips requesting to be seen by a nurse during this time; and (3) failed to introduce evidence demonstrating that he was harmed by any delay in treatment. *See id.* at *7–8.

The district court similarly granted summary judgment on the claims against Doctor Waldridge and Jailer Rodgers because there was no underlying constitutional violation by any SHP nurses, and because Jailer Rodgers was entitled to rely on the assessment of medical professionals. *Id.* at *8. It then granted summary judgment in favor of the county because there was no underlying constitutional violation. *Id.* at *9. Finally, the court dismissed the state-law claims because it declined to exercise pendent jurisdiction in the absence of another basis for federal jurisdiction. *Id.*

Griffith timely appealed, and Defendants all filed cross appeals to challenge the district court's holding that the objective test identified in *Kingsley* applies to these claims.

## II.  Standard of Review

"We review a district court's grant of summary judgment de novo." *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (internal quotations and citation omitted). Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, "the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008)). But, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  The Right to Medical Care

The Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains.  *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Rhinehart v. Scutt*, 894 F.3d 721, 736–37 (6th Cir. 2018); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).  The Eighth and Fourteenth Amendments are violated "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see Estelle*, 429 U.S. at 103–04 (right to medical care under Eighth Amendment); *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982) (medical care under Fourteenth Amendment for involuntarily committed mental patient); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (explaining that following arrest and before adjudication of guilt, due process rights to medical care "are at least as great as the Eighth Amendment protections available to a convicted prisoner").

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008)); *see Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) ("The Eighth Amendment protection against deliberate indifference extends to pretrial detainees in state prisons by operation of the Due Process Clause of the Fourteenth Amendment."); *Blackmore*, 390 F.3d at 895.

This court has consistently applied the same "deliberate indifference" framework to Eighth-Amendment claims brought by prisoners as Fourteenth-Amendment claims brought by pretrial detainees.  *See, e.g.*, *Rinehart*, 894 F.3d at 737 (Eighth Amendment); *Blackmore*, 390 F.3d at 895 (Fourteenth Amendment); *see also Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) ("This Court has historically analyzed Fourteenth Amendment pretrial detainee claims and

Eighth Amendment prisoner claims 'under the same rubric.'" (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013))).  This two-part framework contains both an objective component—a "'sufficiently serious' medical need"—and a subjective component—a "sufficiently culpable state of mind." *Blackmore*, 390 F.3d at 895 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

### A.     Objective Component

"The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the [Constitution]." *Rhinehart*, 894 F.3d at 737. A sufficiently serious medical need "is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897).  However, if the plaintiff has received medical attention and seeks redress based on the inadequacy of the care, "[t]here must be 'medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain.'" *Rhinehart*, 894 F.3d at 737 (second alteration in original) (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)).

The district court found—and the parties do not dispute—that Griffith suffered from a sufficiently serious medical condition.  Griffith suffered two seizures at the jail and a third after being transferred to a hospital, and he did not stabilize until he was airlifted to UK Hospital. Moreover, Griffith has introduced medical evidence that his treatment was inadequate.  The expert report of Madeline LaMarre states:

> SHP nurses also failed to notify Dr. Waldridge or Jane Bartram APRN of his condition in accordance with SHP policy and procedures, treatment protocols, and as required by their scope of nursing practice.  As a result, Mr. Griffiths' [sic] condition deteriorated until he developed seizures and was transported emergently to the hospital.  By the time he was admitted to the hospital he was in critical condition due to kidney failure and lactic acidosis.

Report of Madeline LaMarre, R. 101-26 at PageID 4067.

The report also states that "Mr. Griffith's urinalysis was grossly abnormal showing proteinuria and hematuria which are indications of acute or chronic kidney injury, a potentially serious medical condition which required immediate medical evaluation and treatment." *Id.* at PageID 4065. Thus, the only issue is whether Griffith satisfied the subjective component. As indicated, the district court held that pretrial detainees such as Griffith can satisfy the subjective component even without a showing of actual subjective knowledge.

## B.        Subjective Component

To satisfy the subjective component under the Eighth Amendment, "the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Winkler*, 893 F.3d at 891 (quoting *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)). Under this standard, "the plaintiff must show that each defendant acted with a mental state 'equivalent to criminal recklessness.'" *Rinehart*, 894 F.3d at 738 (quoting *Santiago*, 734 F.3d at 591). "This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)); *see Richmond*, 885 F.3d at 939.

To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart*, 894 F.3d at 738 (quoting *Farmer*, 511 U.S. at 842). But "[a] doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Id.* Accordingly, "[w]here the plaintiff has received some medical treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)); *see Rhinehart*, 894 F.3d at 738 ("[W]hen a claimant challenges the adequacy of an inmate's treatment, 'this Court is deferential to the judgments of medical professionals.'" (quoting *Richmond*, 885 F.3d at 940). A plaintiff can nevertheless satisfy this standard by demonstrating that a medical professional "consciously expos[ed] the patient to an excessive risk of serious harm" in administering treatment, *Richmond*, 885 F.3d at 940 (quoting *LeMarbe v.*

*Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)), or rendered medical care "so woefully inadequate as to amount to no treatment at all," *id.* (quoting *Asplaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

The text of the Eighth Amendment mandates this showing of subjective knowledge for claims brought by prisoners: "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838; *see Rhinehart*, 894 F.3d at 736 (explaining that the requirement to establish a subjective component "all goes back to the text of the Eighth Amendment").

The Fourteenth Amendment, of course, does not contain the word "punishment." *See* U.S. Const. amend. XIV. Moreover, the State does not detain individuals in order to impose "punishment" prior to a formal adjudication of guilt; the State is permitted to detain such persons before trial to "ensure[e] that persons accused of crimes are available for trials and, ultimately, for service of their sentences," *Bell v. Wolfish*, 441 U.S. 520, 534 (1979), or to further other regulatory, nonpunitive interests, *see United States v. Salerno*, 481 U.S. 739, 746–47 (1987) (upholding Bail Reform Act because it allowed detention as an exercise of "permissible regulation" rather than "impermissible punishment").

Indeed, pretrial detainees cannot be punished at all, and there is accordingly "no need, as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional." *Kingsley*, 135 S. Ct. at 2475. Accordingly, the "proper inquiry" to evaluate the conditions of confinement for a pretrial detainee is "whether those conditions amount to punishment." *Wolfish*, 441 U.S. at 535. The Court has instructed that "[a]bsent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the challenged condition] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* at 538–39 (third alteration in original) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

Despite these differences, we have nevertheless explained that it is appropriate to apply the Eighth Amendment standard to pretrial detainees because applying the *Wolfish* test would yield the same deliberate-indifference standard. *See Roberts v. City of Troy*, 773 F.2d 720, 724–25 (6th Cir. 1985). In *Roberts*, we explained that the appropriate test under *Wolfish* is whether the challenged condition is reasonably related to a legitimate government objective. *Id.* at 723 (citing *Wolfish*, 441 U.S. at 535). We reasoned that this test is applied to determine whether prison officials are acting with improper punitive intent or pursuant to proper regulatory goals; thus, we concluded that "*Bell v. Wolfish* requires an intent to punish." *Id.* at 725. Based on that straightforward logic—that the punitive intent required under *Wolfish* is the same "punishment" governed by the Eighth Amendment—we adopted the deliberate-indifference test wholesale for purposes of the Fourteenth Amendment. *See id.*; *see also, e.g.*, *Villegas v. Metropolitan Gov't. of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (citing *Roberts*, 773 F.2d at 723); *Daniels v. Woodside*, 396 F.3d 730, 735 (6th Cir. 2005) (same); *Blackmore*, 390 F.3d at 895 (same).

Griffith argues, and the district court held, that this approach is no longer appropriate in light of *Kingsley*. There, the Supreme Court held that a pretrial detainee could prevail on an excessive-force claim under the Fourteenth Amendment without proving that the defendant was subjectively aware that the force was excessive. *See* 135 S. Ct. at 2473. The Court divided the state-of-mind inquiry for an excessive force claim into two separate components. The first involves the state of mind as to the physical act that is alleged to be excessive. *Id.* at 2472. This inquiry remains subjective; the use of force itself must be deliberate, as opposed to accidental or negligent. *Id.* The second inquiry is the "state of mind with respect to the proper *interpretation* of the force," or in other words, whether that force was excessive. *Id.* The Court held that this inquiry was objective, and a plaintiff need only show that the force used against him was "objectively unreasonable." *Id.* at 2473.

The Court also explained that an objective test is consistent with its Fourteenth Amendment jurisprudence. The Court's precedents in this area have held that pretrial detainees cannot be subject to "the use of force that amounts to punishment." *Id.* at 2473 (citing *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). The Court explained that "punishment" includes, clearly, an "expressed intent to punish." *Id.* (discussing *Wolfish*, 441 U.S. at 540). But even

without an expressed intent to punish, "a pretrial detainee can . . . prevail by showing that the [challenged] actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Wolfish*, 441 U.S. at 561). It therefore reasoned that the Fourteenth Amendment inquiry in that context was already objective.

Following *Kingsley*, the circuits have divided on whether an objective test similarly governs conditions-of-confinement claims brought under the Fourteenth Amendment. *Compare Miranda v. County of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018) (applying objective test under *Kingsley*); *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017) (same); *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc) (same), *with Whitney v. City of St. Louis*, 887 F.3d 857 (8th Cir. 2018) (holding that *Kingsley* did not modify the standard for Fourteenth-Amendment conditions-of-confinement claims); *Nam Dang by and through Vina Dang v. Sheriff, Seminole Cnty Florida*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2019) (same). Our court has generally stayed out of the fray. We have found it unnecessary to answer the question each time we have confronted the issue, instead holding that the same result would obtain under either the subjective test dictated by *Farmer* or by a purely objective test derived from *Kingsley*. *See, e.g.*, *Martin v. Warren County*, 799 F. App'x 329, 338 n.4 (6th Cir. 2020) (leaving the *Kingsley* question for another day because plaintiff could not prevail under either standard); *Richmond*, 885 F.3d at 938 n.3 (not addressing argument because it was not raised).

The district court adopted the test from the Second Circuit and held that Griffith could prevail simply by showing that the defendants "recklessly failed to act with reasonable care to mitigate the risk that the [medical] condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Griffith*, 2019 WL 1387691, at *5 (quoting *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018)). It nevertheless held that Griffith failed to satisfy this lower requirement. *See id.* at *8.

We agree that Griffith cannot prevail under either test, and therefore reserve the question for another day.[5] As we explain below, Griffith's proof establishes, at most, a negligence claim sounding in state tort law. And "[w]hatever *Kingsley* requires, it is more than negligence." *Martin*, 799 F. App'x at 338 n.4; *see Kingsley*, 135 S. Ct. at 2472 ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." (emphasis in original) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998))).[6]

Griffith argues that Defendants were deliberately indifferent because they failed to adequately monitor him for drug withdrawal, allowing his vomiting to progress to the point of dehydration. He argues that this dehydration led to his kidney failure which, in turn, caused his seizures. Griffith contends that RN Sherrow, LPN Trivette, and LPN Mundine are individually liable because they violated his constitutional rights. Further, Griffith contends that Dr. Waldridge and Jailer Rogers are individually liable under a theory of supervisor liability. Finally, Griffith asserts that SHP collectively and the County respectively are under a theory of *Monell* liability. We address the subjective component individually for each defendant. *Rinehart*, 894 F.3d at 738 (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).

---

[5]Respectfully, we disagree with the dissent's suggestion that we are "ignor[ing] Supreme Court precedent," *see* Dissent at 8, by leaving the question for another day. *See Martin*, 799 F. App'x at 338 n.4; *Richmond*, 885 F.3d at 938 n.3. Instead, we simply find that Griffith could not prevail under either standard. As the Supreme Court has stated, "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944); *see Matal v. Tam*, 137 S. Ct. 1744, 1755 (2017); *Clinton v. Jones*, 520 U.S. 681, 690 (1997) ("[W]e have often stressed the importance of avoiding the premature adjudication of constitutional questions."); *Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case."); *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754 (6th Cir. 2019) ("[Federal courts will not] decide questions of a constitutional nature unless absolutely necessary to a decision of the case or formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (internal quotation marks omitted)). It is common practice to assume without deciding an issue—even a constitutional issue—that is unnecessary to the judgment. *See, e.g.*, *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1965 (2018); *Nat'l Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 138 (2011).

[6]It is clear that the constitutional standard must be something more than negligence. *See, e.g.*, *Martin*, 799 F. App'x at 38 n.4. For that reason, we reject Griffith's contention that even the Second Circuit's standard the district court adopted is itself too high a burden after *Kingsley* because it requires the plaintiff to prove objective recklessness. Griffith essentially asks us to apply an ordinary negligence standard, and we decline to do so. *See Kingsley*, 135 S. Ct. at 2472.

**IV.  Discussion**

Griffith asserts claims against two separate groups of defendants.  First, he asserts claims against the SHP defendants—the individual nurses that provided treatment, their supervisor, and SHP collectively.  Second, he asserts claims against Franklin County and Jailer Rogers under theories of *Monell* and supervisory liability, respectively.  We address each in turn.

**A.       SHP Defendants**

We consider Griffith's claims against the SHP Defendants in the following order: (1) RN Sherrow; (2) LPN Trivette; (3) LPN Mundine; (4) Dr. Waldridge; and (5) SHP collectively.

**1.       Nurse Sherrow**

Griffith argues that Sherrow was deliberately indifferent because she did not put Griffith on the list to be seen by an APRN before Wednesday, when she performed the urine dip test.  He contends that at that time, Sherrow should have called Dr. Waldridge or an APRN rather than place him on the weekly list, and he further faults Sherrow for not initiating SHP's drug withdrawal policy or nausea/vomiting protocol at some point during his detention.  He also asserts that Sherrow was deliberately indifferent when she removed him from detox monitoring and allowed him to return to general population.

Sherrow interacted with Griffith three times during his period of detention, each of which occurred while he was being held in the detox cell.  She first interacted with him on Monday, November 9th at 7:42 a.m. to complete the Suicide Prevention Screening Guidelines Form when he was on his way to pretrial.  She assessed his mental health and indicated that he was no longer showing signs of depression or anxiety.  She recorded that he was experiencing nausea, but apparently did not take any action to follow up on his complaint.  She indicated on the form that the deputy jailers had been conducting monitoring, but she did not herself review the observation log.

To be sure, it may have been preferable for Sherrow to have taken a more aggressive course of action at this time in response to Griffith's complaint of nausea and vomiting.  Perhaps initiating the detox protocol would have given the medical staff a better opportunity to monitor

Griffith's condition and allow them to intervene before he suffered a seizure several days later. But, when she conducted the screening, Sherrow made a decision that Griffith's condition did not warrant elevation to medical observation. Sherrow testified that regardless of whether jail staff designates an inmate for observation, the medical staff makes an independent evaluation as to whether to place the inmate on medical observation. Based on the signs and symptoms that Griffith exhibited, Sherrow made the decision that further observation by medical was not necessary. Specifically, she indicated that observation would be appropriate for an inmate who was "hallucinat[ing], sweating, can't [sic] get up." Sherrow Dep., R. 75-5 at PageID 2013. She further testified that she would make the decision to place an inmate in medical observation based on their vital signs and other visible symptoms.

There is no evidence that Sherrow "knew, or should have known," that Griffith was suffering severe withdrawal symptoms that would lead to a series of seizures several days later or otherwise "posed an excessive risk to health or safety." *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018). To the contrary, Griffith has not introduced any evidence that his vomiting was caused by drug withdrawal, or that he was suffering drug withdrawal at all. Instead, he testified that he had been vomiting because of nerves.

Even putting aside the issue of drug withdrawal, there is no evidence that Sherrow knew or should have known that Griffith's vomiting evinced a substantial risk to his health. Griffith now contends that his vomiting caused him to experience dehydration, which in turn led to his seizures. But again, there is no medical evidence to support his theory. The UK Hospital discharge report said "his seizure was most likely due to PRES . . . . The cause of PRES was either due to his acute renal failure or possible intoxication." UK Discharge Summary, R. 69-33. And the FRMC report, the document upon which Griffith relies, does not say that his renal failure was caused by dehydration. Instead, it says: "[Griffith's] presentation is complex. Differential [diagnosis] is broad." FRMC Physician Record, R. 101-18 at PageID 3892. It then discusses potential causes for his renal failure and seizures (including rhabdomyolysis, HUS, toxic ingestion, serotonin syndrome, encephalitis, or meningitis) without reaching any resolution. Moreover, Griffith's expert testified that she did not think that dehydration was the primary source of his kidney failure, and she declined to testify definitively that he suffered dehydration

(rather than simply being dehydrated). Accordingly, there is no evidence that Sherrow should have known, based on Griffith's report of vomiting on Monday, November 9th, that he was at risk of dehydration leading to kidney failure and multiple seizures.[7]

There is also no evidence that Sherrow "recklessly failed to act with reasonable care to mitigate [that] risk." *Bruno*, 727 F. App'x at 720. Based on her assessment, Sherrow did not consider Griffith to be at a high risk requiring medical observation. She testified that this was in part because of the signs and symptoms that she witnessed, and in part because Griffith or the deputy jailers could fill out a sick call slip if his conditioned worsened. "[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials." *Rouster v. County of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014) (alteration in original) (quoting *Jones v. Muskegon County*, 625 F.3d 935, 944 (6th Cir. 2010)). Even if Sherrow was negligent in failing to take more aggressive steps in monitoring Griffith, that would only constitute a claim of medical malpractice that lies beyond the Constitution's reach. "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

For example, we have held that a prison doctor was not deliberately indifferent when he misdiagnosed the plaintiff's cancer and attempted to treat the condition with over-the-counter medications. *See Jones*, 625 F.3d at 945–46. Similarly, we have twice held that prison medical officials were not deliberately indifferent when they misdiagnosed two severe ulcers—both of which were lethal—as symptoms of drug or alcohol withdrawal. *See Winkler*, 893 F.3d at 892–93; *Rouster*, 749 F.3d at 448–51. In *Rouster*, the prison nursing staff had misdiagnosed

---

[7]For this reason, Griffith's reliance on *Clark-Murphy v. Foreback* is unpersuasive. *See* 439 F.3d 280 (6th Cir. 2006). There, the inmate died of dehydration after being held in an observation cell for multiple days in 90-degree heat without access to water. He also repeatedly asked for water and was seen drinking out of the toilet. The court held that collectively, this evidence was sufficient for a jury to infer that the jailers were subjectively aware that he was suffering dehydration. *See id.* at 289–90. By contrast, Griffith's reports of vomiting to Trivette and Sherrow do not suggest that they knew, or should have known, that Griffith was at a risk of extreme dehydration that would cause acute renal failure which would, in turn, lead to a seizure. As discussed, there is no evidence that Griffith suffered dehydration. Moreover, the unrebutted evidence, discussed *infra*, demonstrates that Trivette took several measures to monitor for the possibility of dehydration in response to his complaints of vomiting and diarrhea.

ulcers as potential alcohol withdrawal, even though the plaintiff was seen eating food off the ground, drinking out of the toilet, and otherwise behaving erratically in ways not consistent with alcohol withdrawal. *See* 749 F.3d at 449. But, we explained, the medical staff did not know he had previously been treated for a perforated ulcer and therefore did not have the information necessary to make the appropriate diagnosis. *See id.* at 448.**[8]** Accordingly, the nursing staff did not violate the Constitution by attempting to treat the plaintiff, even though the treatment ultimately was unsuccessful. *See id.*; *see also Winkler*, 893 F.3d at 892–93 ("Although [the defendant's] assessment and treatment of [the detainee] might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to [the detainee's] health.").

When Sherrow interacted with Griffith on the morning of Monday, November 9th, she completed the screening for potential suicide risk or mental health, which was the main reason Griffith was held by jail staff for observation. She recorded that he no longer presented such a risk based on her evaluation. She also noted his report of nausea, but she did not believe further action was needed based on his symptoms at that time and on her judgment and experience. She testified that Griffith would be able to submit a sick slip if he was experiencing further symptoms, and he in fact did submit such a slip and was treated by Trivette later that day during his full medical intake. The failure to take further steps based only on his statement that he was experiencing vomiting and nausea cannot rise to a level above negligence.

---

**[8]**The evidence suggests that, as in *Rouster* and *Winkler*, Griffith's medical emergency arose from a latent issue that existed prior to his detention. He was already vomiting before he was admitted to the jail, beginning when he was struck with a baseball bat during the failed robbery. However, there is no evidence that Griffith informed the medical staff that he had been in a violent confrontation and had been vomiting ever since. Thus, Griffith would also not prevail on a theory that the medical staff failed to discover an underlying medical issue originating at the burglary because the medical staff did not have the "critical piece of information" that he had been in a violent incident. *See Rouster*, 749 F.3d at 448. The dissent suggests that we are overemphasizing the uncertainty about the cause of Griffith's medical condition. *See* Dissent at 13 n.2. We disagree because, even accepting the dissent's formulation, the test requires that we determine what a reasonable nurse "would have known, or should have known," about Griffith's condition. *See id.* at 10. That medical professionals were unable to identify what happened to Griffith, even with the benefit of hindsight, weighs strongly against a finding that a reasonable nurse "would have known, or should have known," the extent of his condition at the time of treatment. *Accord LeMarbe*, 266 F.3d at 436 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the fact that the risk was obvious." (quoting *Farmer*, 511 U.S. at 842)).

Sherrow next saw Griffith the following day, Tuesday, November 10th, at 7:50 a.m. to administer medicine.  Sherrow could not recall the length of this interaction, but indicated that based on her notes, Griffith did not make any other complaints at that time.  There is no evidence from this interaction that she was or should have been aware that Griffith was suffering from a serious medical issue or that his condition had worsened.

Finally, Sherrow saw Griffith on Wednesday, November 11th, and provided treatment along with Trivette.  Sherrow performed the urine dip test while Trivette provided Imodium, Mylanta, and Gatorade.  Consistent with the instructions on the urine dip test, Sherrow added Griffith to the list to be seen by an APRN on the next weekly visit to review the results of the urine test.

Again, it would have been preferable if Sherrow had immediately elevated Griffith's test results to an APRN rather than putting him on a list to be seen on the next weekly visit.  Perhaps that was even what the standard of care dictated.  But Griffith acknowledges that Sherrow did administer the urine test, review the results, and elevate those results to the APRN.  Moreover, Sherrow witnessed Trivette provide over-the-counter treatment for his symptoms as well as Gatorade.  Sherrow also witnessed that Griffith was able to drink the Gatorade without vomiting or other negative reaction, a fact that, in her experience, indicated that his medical status was stable.

The decision to elevate Griffith's results via the weekly list rather call an APRN directly may be evidence that Sherrow underestimated the severity of Griffith's condition, but it does not demonstrate that she "recklessly failed to act with reasonable care to mitigate [the] risk," *Bruno*, 727 F. App'x at 720, or that she should have known that his medical condition was declining.[9]

---

[9]The dissent suggests that we are ignoring the "context" of Sherrow's decision to elevate Griffith's condition to an APRN by placing him on the weekly list rather than immediately placing a phone call or transferring him to the emergency room.  *See* Dissent at 13.  But it is the dissent that ignores the context of Griffith's period of detention by focusing exclusively on this single interaction between Griffith and Nurse Sherrow.  This meeting occurred only because Nurse Trivette was taking affirmative steps to monitor Griffith's condition, not in response to a sick call slip.  Indeed, Griffith only requested medical attention on two occasions—on September 9th and September 10th.  The unrebutted evidence demonstrates that Nurse Sherrow and Nurse Trivette provided treatment to Griffith on September 11th, and Griffith never indicated that the treatment provided was insufficient or that his condition was not improving.  Further, it is undisputed that Griffith's condition *was* elevated to an APRN when he

There is also no evidence that by placing him on the weekly list rather than calling an APRN, Sherrow "consciously expos[ed] [Griffith] to an excessive risk of serious harm," *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018) (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)), or provided care "so woefully inadequate as to amount to no treatment at all," *id.* (quoting *Asplaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Griffith and the dissent rely on *LeMarbe*, but that reliance is misplaced. There, a surgeon conducting exploratory surgery visually observed five liters of bile that had leaked into the plaintiff's abdomen. *See* 266 F.3d at 433. But the surgeon was unable to determine the source of the leak and simply drained the fluid and closed the surgical incision. *Id.* Even though he knew that bile was leaking into the plaintiff's abdomen, knew that he had not identified or remedied the leak, and knew the continuing bile leakage required immediate medical attention, the surgeon discharged the plaintiff several days later without taking any further action. *Id.* We held that this was evidence of deliberate indifference. *See id.* at 439.

That case is distinguishable in two important respects. The first involves what the defendant knew or should have known. There, the surgeon personally saw five liters of bile that had leaked into the plaintiff's abdomen, which exposed a risk of harm that was "extreme and obvious to anyone with a medical education and to most lay people." *Id.* at 437. In contrast, Nurse Sherrow saw the results of a urine test that indicated a potential abnormality. Even Griffith's expert report does not speak in the unequivocal language used in *LeMarbe*: Griffith's expert stated only that the urinalysis shows "a potentially serious medical condition which required immediate medical evaluation and treatment." Report of Madeline LaMarre, R. 101-26 at PageID 4065. Second, and more importantly, *LeMarbe* differs from this case because of the evidence there indicating the surgeon "disregarded" the risk. *LeMarbe*, 266 F.3d at 438. The surgeon in *LeMarbe* took no further steps to address the leaking bile; he simply ended surgery and discharged the patient. *Id.* at 433. In contrast, Nurse Sherrow elevated Griffith's condition to an APRN by placing him on the weekly list. It is therefore undisputed that Griffith's medical condition was still under review and that he would have received further treatment. Even if

was placed on the weekly list. The dissent also ignores the three full days Griffith spent in general population, during which time Nurse Sherrow had no information about his condition.

Sherrow's chosen approach was negligent, that is not enough to satisfy Griffith's evidentiary burdens, either under *Farmer* or *Kingsley*: "Whatever *Kingsley* requires, it is more than negligence." *Martin v. Warren County*, 799 F. App'x 329, 338 n.4 (6th Cir. 2020).

Finally, for two reasons there is no merit to Griffith's contention that Sherrow's deliberate indifference is demonstrated because Griffith was released into the general population or because she did not follow up with Griffith after that time. First, Griffith had been held for observation by jail staff and the Kentucky Jail Mental Health Crisis Network, not medical staff. Accordingly, the recommendation to release him into general population came not from the nurses but from Clinician Thompson with the Kentucky Jail Mental Health Crisis Network. There is no evidence to suggest that the nursing staff was responsible for releasing Griffith into general population. Second, there is no evidence that the nursing staff should have affirmatively followed up with Griffith for continued monitoring. To the contrary, the expectation was that either Griffith or a deputy jailer would submit a sick slip if he needed further attention. There is no evidence that the nurses should have expected that Griffith's condition was deteriorating or that they could have known that their attempts to treat his condition had been unsuccessful.

In sum, Sherrow had three brief interactions with Griffith over the course of his time in detox. During that period, she conducted a urine sample that contained information about his condition and elevated the test results to an APRN. Griffith made no effort to obtain further care other than the two sick call slips he filled out in detox, and there is no evidence that Sherrow would have expected that he had not responded to the treatment provided by herself and Trivette. Sherrow's treatment may have been suboptimal, but it does not rise to the level of a constitutional violation. We therefore affirm the grant of summary judgment in favor of Sherrow.

### 2.     Nurse Trivette

Griffith argues that Trivette was deliberately indifferent because she did not call Dr. Waldridge or an APRN when she saw Griffith on Monday and Tuesday and because she did not implement SHP's drug withdrawal policy or the nausea/vomiting protocol. Griffith further contends that Trivette failed to make other arrangements after trying to place Griffith in a dry

cell and finding that none was available.  He also asserts that Trivette demonstrated a culpable mental state because she provided Immodium, Mylanta, and Cipro without first calling Dr. Waldridge or an APRN.  Finally, Griffith claims that Trivette was deliberately indifferent when she allowed Griffith to be released into the general population and took no further efforts to check on his status.

Griffith submitted his first sick call slip on Monday morning after Sherrow conducted his initial screening.  Trivette then met with Griffith at 10:00 a.m. both to conduct his medical intake screening and to respond to the sick call slip.  Trivette took Griffith's vital signs, conducted the medical observation, and noted that Griffith had reported nausea, diarrhea, and vomiting. Because of this complaint, Trivette assessed Griffith's hydration by performing a skin turgor test, and she reported that his skin was "race appropriate & [had] good turgor," and further noted that she had reviewed Griffith's hydration.

Griffith indicated that he was unable to urinate, so Trivette scheduled him to provide a urine sample the following day.  Further, Trivette assessed Griffith to determine whether he was at risk to suffer withdrawal from drugs or alcohol and, based on his reported drug use, indicated that he did not appear to be under the influence of or withdrawing from drugs or alcohol.  She testified that she made this determination because he was not experiencing more extreme symptoms, such as "sweating, shaking delusions," or extreme emotions such as anger.  Trivette Dep., R. 75-7 at PageID 2278.  Based on that assessment, Trivette did not initiate a detox protocol.

Although in hindsight we can say that it may have been preferable for Trivette to have taken a more aggressive approach to monitoring, there is no evidence that she was aware, or should have been aware, that Griffith was in need of immediate emergency medical care.  *See Bruno*, 727 F. App'x at 720.  There is no evidence that Trivette should have recognized, based only on Griffith's complaint of "stomach/vomiting," inability to urinate, and reported daily use of marijuana and weekend use of Xanax, that he would suffer significant withdrawal symptoms, leading to dehydration and multiple seizures.  As indicated, the medical evidence submitted by Griffith still does not support the theory that he was suffering dehydration or that such dehydration caused his seizures.

Further, there is no dispute that Trivette provided treatment by administering over-the-counter medications to ease Griffith's symptoms in response to his complaints. *See Rouster*, 749 F.3d at 448–49 (emphasizing that the defendants "took appropriate steps" in response to plaintiff's condition, including provision of over-the-counter medications). "To be sure, medical providers may 'not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of a risk that [they] strongly suspected to exist." *Id.* at 451 (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994)). However, the unrebutted evidence demonstrates that Trivette took steps to identify the source of Griffith's condition and attempted to treat it each time he complained of continuing symptoms. Trivette was aware that Griffith was experiencing nausea and gastrointestinal distress, and she took steps to alleviate his symptoms. She provided over-the-counter treatment and scheduled a urine test to gather more information. She also checked his vital signs, tested for dehydration, and assessed whether he presented a risk of drug withdrawal.

After providing over-the-counter medication and conducting his medical screen on Monday, Trivette next saw Griffith later in the day to provide medication, seemingly without incident.

Griffith filled out his second sick call slip the following day. Nurse Trivette responded to his complaint and evaluated the condition of his skin, abdomen, gait, and skin turgor. Further, Trivette again checked him for dehydration. Because he was still unable to urinate, Trivette attempted to place him in a dry cell for observation but was unable to do so because no such cells were available.

Griffith never filled out another sick slip, but Trivette saw Griffith once more the following day to perform the urinalysis. This time, Griffith was able to urinate, so he provided a sample for the dip test. He also complained of vomiting, and Trivette provided more over-the-counter medications and Gatorade. She witnessed him drink the Gatorade without incident while Sherrow administered the urine test. Trivette reviewed the sample and determined that, in her experience, the sample indicated that there was a risk that Griffith was experiencing an infection, so she prescribed Cipro to treat the infection. Further, Sherrow added Griffith to the list to be

seen by the APRN at the next visit.  Trivette testified that the nurses took this approach because they wanted the samples reviewed but were not alarmed by the test results.**10**

Trivette therefore responded to all of Griffith's complaints, attempted to treat his condition, and performed tests to identify its cause.  Because of these steps, Griffith received a urinalysis and his condition was elevated to an APRN by designating him on the weekly list. Even if Sherrow's "assessment and treatment of [Griffith] might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to [Griffith's] health." *Winkler*, 893 F.3d at 892.

Griffith also contends that Trivette's mental culpability is demonstrated because she failed to follow SHP's internal policies by providing over-the-counter medication and Cipro without contacting Dr. Waldridge and by failing to initiate the detox protocol.  But we have held that "the failure follow internal policies, without more, [does not] constitute deliberate indifference." *Id.* at 891–92 (citing *Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010)).  We therefore affirm the grant of summary judgment in favor of Trivette.

### 3.    Nurse Mundine

Griffith argues that Mundine was deliberately indifferent because she failed to take earlier action to elevate Griffith's status to a doctor or an APRN.  He argues that her deliberate indifference is demonstrated because she failed to affirmatively look for him when he failed to come and receive his medicine on Saturday morning.  Further, he contends that she did not act quickly enough in response to his first seizure, and that she acted improperly by calling RN Sherrow for treatment advice rather than calling Dr. Waldridge or an APRN.

---

**10**In reaching the contrary conclusion, the dissent fails to recognize that "[w]e address the subjective component individually for each defendant." *Rinehart*, 894 F.3d at 738 (citing *Garretson*, 407 F.3d at 797).  The dissent would hold Trivette to have acted with deliberate indifference simply "for the reasons applicable to Sherrow," Dissent at 14, even though both nurses testified that it was Sherrow, not Trivette, that performed the urine test.  The dissent fails to explain why Trivette demonstrated deliberate indifference by declining to override the judgment of Sherrow (Trivette's superior) and call an APRN directly to report the results of a test that she did not herself perform.  Trivette's attempt to provide immediate treatment to Griffith by prescribing an antibiotic to treat a perceived infection further weighs against a finding of deliberate indifference.  By focusing only on the fact that this treatment was incorrect, the dissent fails to accord the appropriate deference to the "medical judgment of prison medical officials," *Rouster*, 749 F.3d at 448 (quoting *Jones*, 625 F.3d at 944), and ignores our frequent admonition against constitutionalizing claims for medical negligence, *see Burgess*, 735 F.3d at 478.

Griffith's arguments are without merit. As an initial matter, Griffith relies exclusively on *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004) for the proposition that Mundine violated the Constitution by delaying Griffith's treatment. However, that case only involved whether a plaintiff could demonstrate a sufficiently serious medical need to satisfy the objective component by introducing evidence of a delay in treatment of an obvious medical need even without medical proof of harm caused by the delay. *See Blackmore*, 390 F.3d at 899–900. As discussed, the objective component is not at issue here, so the case is wholly inapposite.

Moreover, we find no evidence that Mundine disregarded any risk to Griffith's safety. Mundine responded to Griffith's first seizure and immediately conducted an examination of his condition. She had him escorted to booking where she continued to examine him, tested him for drugs, and listened to Griffith's complaint that he had been vomiting. She responded to this complaint by prescribing an anti-nausea drug and providing him Gatorade. After Griffith stabilized and requested to go back to his cell, Mundine permitted him to go to his cell— provided that he move to a lower bunk—while she continued reviewing his file. Mundine testified that she was still reviewing his file at the time of Griffith's second seizure, at which time she immediately sent Griffith to the emergency room.

Griffith contends that Mundine did not follow SHP protocol with regard to seizures. That, he maintains, amounts to deliberate indifference. But, because "the failure to follow internal policies, without more, [does not] constitute deliberate indifference," *Winkler*, 893 F.3d at 891, Griffith's arguments fail.[11]

Griffith points to no additional steps that Mundine should have taken and, because he suffered a second seizure before she had the opportunity to finish reviewing his file, it is hard to imagine what else she could have done. There is certainly nothing to suggest that she "acted *intentionally* to impose the alleged condition, *or recklessly* failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-

---

[11]The dissent acknowledges that the failure to follow internal procedures cannot alone establish deliberate indifference, but points to little else in reaching its conclusion. *See* Dissent at 15–16. The undisputed facts demonstrate that Mundine responded immediately to Griffith's seizure, provided appropriate care, contacted Sherrow to get further guidance, and had not even completed review of Griffith's file at the time he suffered his second seizure.

official *knew, or should have known*, that the condition posed an excessive risk to health or safety." *Bruno*, 727 F. App'x at 720 (emphasis in original) (quoting *Darnell* 849 F.3d at 35). We therefore affirm the grant of summary judgment in favor of Nurse Mundine.

### 4.     Dr. Waldridge

Griffith argues that Dr. Waldridge is liable under a theory of supervisory liability. Section 1983 liability of supervisory personnel "must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of *respondeat superior.* There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Doe v. Claiborne County*, 103 F.3d 495, 511 (6th Cir. 1996) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). Accordingly, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1999)); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[E]ach Government official . . . is only liable for his or her own misconduct.").

Moreover, a plaintiff cannot establish a claim for supervisory liability without establishing an underlying constitutional violation by a supervised employee. *See, e.g.*, *McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 470 (6th Cir. 2006) ("Because [the plaintiff] also has not pointed to unconstitutional conduct by any other employee supervised by [the individual defendant], it necessarily follows that the supervisory liability claim . . . must fail."). Because Griffith has failed to establish that his constitutional rights were violated by Sherrow, Trivette, or Mundine, his claim against Dr. Waldridge fails as well. *See id.*  We therefore affirm the grant of summary judgment in favor of Dr. Waldridge.

**5.      SHP Collectively**

Griffith also argues that SHP collectively can be held liable on a theory of *Monell* liability.   He argues that this court has already held that SHP's training procedures were inadequate in *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015).

Griffith's argument is unconvincing because he has made no effort to develop any facts about the training that the SHP nurses in this case received.  Indeed, Griffith's expert disclaimed any opinion on the adequacy of SHP's training.  In *Shadrick*, the plaintiff was sentenced to a short term of imprisonment and informed medical staff that he had a severe staph infection.  The medical staff failed to provide meaningful treatment, put him in a segregation cell but failed to rigorously monitor him, and he died within four days.  *Id.* at 732–33.  The court held that SHP had failed to train its nurses because "[t]here [was] no indication in the record . . . that S[H]P designed and implemented any type of ongoing training program for its LPN nurses."  *Id.* at 740.  The plaintiff had provided expert testimony who "opined that SHP failed to provide adequate training and supervision to the LPN nurses."   *Id.* at 741.   This court has explained that "[e]specially in the context of a failure to train claim, expert testimony may prove the sole available avenue to plaintiffs to call into question the adequacy of . . . training procedures." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) (quoted in *Shadrick*, 805 F.3d at 741).  Griffith points to no expert testimony or any other evidence to support his failure-to-train claim against SHP.[12]  We therefore affirm the grant of summary judgment in favor of SHP.

**B.      Franklin County Defendants**

Griffith also asserts claims against (1) Jailer Rogers under a theory of supervisory liability, and (2) Franklin County under a theory of *Monell* liability.

---

[12]We have also held in a similar context that a healthcare provider cannot be liable under such a *Monell* theory without proving an underlying constitutional violation by an employee.  *See Rouster*, 749 F.3d at 453–54. We did not impose such a requirement in *Shadrick*, but we need not determine which approach is correct because Griffith cannot prevail even under *Shadrick* given that he has failed to introduce any evidence of training deficiencies by SHP.

### 1.    Jailer Rogers

Griffith brings a claim against Jailer Rogers under a supervisory liability theory.  As discussed, Griffith cannot prevail under this theory without establishing an underlying constitutional violation by a supervised employee.  Because Griffith has failed to establish Griffith's constitutional rights were violated by any deputy jailer or other prison official, the claim against Jailer Rogers fails as well.  *See, e.g.*, *McQueen*, 433 F.3d at 470.  We therefore affirm the grant of summary judgment in favor of Jailer Rogers.

### 2.    Franklin County

Griffith argues that Franklin County is liable because the County (1) had unofficial detox policy of deliberate indifference to detoxing detainees; and (2) failed to train deputy jailers on EMS policies.

"A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'"  *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir.  2013) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).  A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of her rights.  *Monell*, 436 U.S. at 694.  And when a plaintiff seeks to hold a municipality liable on the basis of a facially lawful municipal action which led an employee to violate her rights, she "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  *Brown*, 520 U.S. at 407.

There are four methods of proving a municipality's illegal policy or custom.  The plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

As the Franklin County Defendants point out, Griffith does not articulate any theory of an underlying constitutional violation for which the county could be liable. The County cannot be liable unless Griffith establishes an underlying constitutional violation. *See, e.g.*, *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) ("[W]here there has been no showing of individual constitutional violations . . . there can be no municipal liability."); *Winkler* 893 F.3d at 899–902; *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Griffith appears to argue that even if no individual municipal employee violated his constitutional rights, the collective actions of the municipality still rose to the level of a constitutional violation. He relies on *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985), which held that the municipality could be liable for a policy of failing to adequately monitor an unconscious inmate who had ingested a lethal amount of narcotics. The Tenth Circuit explained that even if no individual employee was deliberately indifferent to his medical condition, "the cumulative effect of what they did pursuant to the practice or policy of the County could be a violation . . . by the County." *Id.* at 309–10. This circuit has expressed a willingness to entertain this theory of municipal liability. *See Winkler*, 893 F.3d at 899–902 (assuming without deciding that municipality may be liable even if no individual employee violated plaintiff's constitutional rights); *Epps v. Lauderdale County*, 45 F. App'x 332, 334–35 (6th Cir. 2002) (Cole, J., concurring) ("A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy."); *see also North v. Cuyuahoga County*, 754 F. App'x 380, 390–93 (6th Cir. 2018) (assuming *Garcia*'s theory of municipal liability applies but finding plaintiffs failed to demonstrate a constitutional violation).

However, even under that theory, the plaintiff still must establish that he suffered a constitutional violation. *See Epps*, 45 F. App'x at 334 (Cole, J., concurring); *North*, 754 F. App'x at 391 ("[B]ecause North has not demonstrated that any individual jail employee violated his Eighth Amendment right to adequate medical care by acting with deliberate indifference, he must show that the municipality itself, through its acts, policies, or customs, violated his Eighth Amendment rights by manifesting deliberate indifference to his serious medical needs.").

As explained, Griffith has failed to do so here, so we need not decide whether such a theory of municipal liability may be viable.

### a.        Detox Policy

Griffith contends that the deputy jailers should have reported Griffith's vomiting to the SHP nurses in addition to monitoring his condition every twenty minutes. He asserts that the deputy jailers' practice in attending to detoxing detainees—in particular, monitoring only for "living, breathing flesh"—was "in complete derogation of the language of and duties imposed by the Jail's written EMS policy." But, as we have already explained, the violation of an internal policy does not establish a constitutional violation. *See, e.g.*, *Winkler*, 893 F.3d at 891–92; *Smith v. Freland*, 954 F.2d 343, 347–48 (6th Cir. 1992).

Moreover, although the deputy jailer's testimony that they were monitoring for "living, breathing flesh" is troubling, the deputy jailers actually monitored Griffith's condition every twenty minutes throughout his forty-eight hours in detox and took detailed notes of his condition each time—including whether he had eaten and how much, whether he was experiencing physical symptoms such as vomiting, and whether he had spoken to the deputy jailer. The deputy jailers testified that they would alert medical staff if a detainee was vomiting excessively or if their condition was deteriorating. Furthermore, Griffith was seen by the medical staff at least two times a day during his stay in detox, and the deputy jailers were entitled to rely on the assessments made by medical professionals. *See, e.g.*, *Winkler*, 893 F.3d at 901 ("[I]t is not unconstitutional for municipalities and their employees to rely on medical judgments made by private medical professionals responsible for prisoner care[.]" (cleaned up)); *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) (explaining that officer was entitled to rely on assessments of medical professionals).

Griffith does not contest that the deputy jailers promptly alerted the medical staff every time he submitted a sick call slip. To be sure, there does appear to have been a miscommunication with regard to Griffith's status—medical staff indicated that he did not seem to be at risk for drug withdrawal while the deputy jailers and prison staff seemed to believe he was being held in a segregated cell because he was detoxing. But there is no evidence that this

was anything other than a single miscommunication in an otherwise functioning system. *See North*, 754 F. App'x at 392 ("While imperfect, the apparent problems . . . seem to consist of 'one or two missteps' rather than the kind of widespread, gross deficiencies that would support a finding of deliberate indifference." (quoting *Daniel v. Cook County*, 833 F.3d 728, 734–35 (7th Cir. 2016)).

Griffith also could not prevail on a theory that the constitutional violation arose out of the deputy jailers' inaction. For such a claim, he would need to prove

> (1) "a clear and persistent" pattern of unconstitutional conduct by [County] employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation . . . .

*Winkler*, 893 F.3d at 902 (second and third alterations in original) (citing *D'Ambrosio*, 747 F.3d at 387–88).

Griffith "discusses only [his own] treatment, and therefore cannot establish that the County had a custom of deliberate indifference to the serious healthcare needs of all the inmates [detained at FCRJ]." *Id.*; *see also Thomas*, 398 F.3d at 433 ("[A plaintiff] cannot rely solely on a single instance to infer a policy of deliberate indifference.").

### b.       Failure to Train

Griffith also argues that the County is liable on a failure-to-train theory. Specifically, he argues that the deputy jailers were not trained on EMS policy or on how to handle detainees suffering withdrawal.

"In order to show that a municipality is liable for a failure to train its employees, a plaintiff must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) (cleaned up) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

Griffith contends that the training program was inadequate because deputy jailers did not receive training on EMS policy. However, this claim is belied by the record. As the Franklin County Defendants point out, Jailer Rodgers and the deputy jailers all testified that they *did* receive training on EMS policy, including on drug addiction, including an eighty-hour training upon hiring and an additional annual training period of either sixteen or twenty-four hours.

To be sure, many of the deputy jailers were unclear about their obligations under the EMS policy, and many acknowledged that they were not sure what to do in the event of a severely detoxing inmate.[13] But, "[e]ven assuming that [Griffith] could show that the County's training of its jail personnel was inadequate, []he presented no proof to show that this inadequacy resulted from deliberate indifference." *Winkler*, 893 F.3d at 902. To establish that the inadequate training resulted from deliberate indifference, a plaintiff must establish (1) "prior instances of unconstitutional conduct demonstrating that the County . . . was clearly on notice that the training in this particular area was deficient and likely to cause injury," *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)), or (2) "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation," *id.* (quoting *Brown*, 520 U.S. at 409).

Griffith does not claim a widespread pattern of similar conduct and instead argues that the County's deliberate indifference to its failure to train can be established under a single-violation theory. The Supreme Court explained in *City of Canton v. Harris* that, in some circumstances, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be

---

[13]For example, Deputy Jailer Fultz testified that he did not know whether the EMS policy identifies drug and alcohol withdrawal as a medical emergency, and that he did not know what the policy said he should do if he observed someone going through drug or alcohol withdrawal. R. 76-8 at PageID 2702. And Deputy Jailer Carender testified that she was not aware of the signs and symptoms of somebody going through detox that indicate that the person's condition may be life-threatening. R. 76-9 at PageID 2718. Deputy Jailer Culbertson testified that he did not receive any instruction about at what point he needs to report to medical personnel regarding the extent of someone's vomiting, and he stated that "I just use my judgment. If they're not lying in a puddle of vomit on the floor and they're not able to get up and move around, then yes, I would notify somebody." R. 76-11 at PageID 2794.

said to have been deliberately indifferent to the need." 489 U.S. 378, 390 (1989). Griffith therefore argues that this is such a case because FCRJ is in a county with a serious drug problem, yet the jailers were unaware of what they were required to do in the event of a severely detoxing detainee.

We find this argument unpersuasive because Griffith failed to demonstrate that Franklin County failed to train its employees "to handle a recurring situation presenting an obvious potential for [the constitutional violation at issue]." *Plinton*, 540 F.3d at 464. As indicated, the evidence demonstrates that the County does provide training on EMS policy, and Griffith has introduced no evidence of any additional training that would been necessary beyond the initial eighty-hour training and subsequent annual training on EMS policy. *See Winkler*, 893 F.3d at 903 ("But [the plaintiff] does not identify what other medical training she believes that the jail personnel should have received. Nor does she explain how the quality of the medical training provided put the County on notice of the likelihood that jail personnel would respond inadequately to an inmate's medical emergency."). Moreover, although Griffith contends that his injury was the result of a "recurring situation"—withdrawal from drugs—there is no evidence that he was vomiting from drug withdrawal or that his vomiting led to his seizure.

Griffith also cannot demonstrate that any training inadequacy "was closely related to or actually caused [his] injury." *Jackson*, 925 F.3d at 834. At its core, his claim is that jailers should have been better trained as to when they needed to alert medical professionals about a particular inmate's deteriorating condition. However, Griffith saw medical staff multiple times per day during his time in detox, and the Deputy Jailers testified that this is the standard practice during detox. Because nothing in the record suggests that the deputy jailers would have done anything other than report to Nurses Trivette and Sherrow, both of whom evaluated Griffith multiple times during his detox period, he cannot demonstrate causation.

For these reasons, we find Griffith's reliance on *Stefan v. Olson* unconvincing. *See* No. 1:10 CV 671, 2011 WL 2621251 (N.D. Ohio July 5, 2011), *aff'd*, 497 F. App'x 568 (6th Cir. 2012). In that case, the detainee informed jail staff that he would experience severe alcohol withdrawal and would suffer seizures when withdrawal symptoms began. *See id.* at *4–6. His condition soon deteriorated, but jail staff failed to adequately monitor his condition and did not

inform medical staff when he began experiencing withdrawal symptoms. *See id.* The district court found that the County was liable for failure to train because the evidence demonstrated that the jail staff "spent *no* money on training its corrections officers" on drug and alcohol withdrawal, even though it had been identified as an area in which there was a "gap in care." *See id.* at \*17 (alteration in original); *see also Rice v. Montgomery County*, No. 5:14-181-KCC, 2016 WL 2596035 (E.D. Ky. May 5, 2016) (finding County liable for failure to train when jail employees received no training on drug withdrawal). Moreover, the on-duty nurse in *Stefan* testified that she would have entered the inmate's cell to begin administering withdrawal protocol if she had known he had vomited. *See* 2011 WL 2621251 at \*16. In contrast, Nurses Sherrow and Trivette were aware that Griffith was vomiting, and there is no evidence that hearing the duplicative information from deputy jailers would have led them to come to a different conclusion. Indeed, Sherrow testified that she would have made the same treatment decisions even if the deputy jailers had reported Griffith's vomiting. We therefore affirm the grant of summary judgment in favor of Franklin County.

## V.  Conclusion

Accordingly, we **AFFIRM** the district court's judgment.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

CLAY, Circuit Judge, concurring in part and dissenting in part. I write separately to explain how I would decide the Fourteenth Amendment deliberate indifference claim presented by this appeal and why I would hold that Nurses Sherrow, Trivette, and Mundine were not entitled to summary judgment.

Plaintiff Austin Griffith appeals the district court's order granting summary judgment for all Defendants. After several days of inadequate medical care at Franklin County Regional Jail ("FCRJ"), Griffith, a pretrial detainee, displayed signs of kidney damage and suffered a seizure. Rather than rush Griffith to a hospital or immediately contact a physician, nurses at FCRJ continued to treat him and returned him to his cell. He was only sent to a hospital after suffering a second seizure a few hours after the first. Griffith now faces lifelong complications from his experience in FCRJ.

Under the standard for deliberate indifference claims brought by pretrial detainees which, in light of recent Supreme Court precedent, only requires an objective showing of deliberate indifference, a reasonable jury could find that the nurses were deliberately indifferent to Griffith's serious medical needs. Because the majority reaches the opposite conclusion, and declines to adopt the correct standard, I respectfully dissent.

### BACKGROUND

Austin Griffith was arrested on November 8, 2015, on suspicion of robbery and assault. During the attempted robbery, Griffith was struck in the back with a baseball bat by the alleged victim. He was brought to FCRJ for pretrial detention on November 8, 2015. Upon arrival, Griffith admitted to recent drug use and was emotionally distraught. He was subsequently placed in a detox cell because he was deemed a moderate suicide risk and was showing possible signs of drug withdrawal. In the detox cell, he was monitored approximately every twenty minutes until he was transferred to the general prison population on November 11, 2015. Griffith reported to his jailers and medical staff that he was suffering from nausea, and he was

observed vomiting seven times during his first night in the jail.  On November 9, 2015, Heather Sherrow, a licensed practical nurse employed by Southern Health Partners ("SHP") (the medical service company that FCRJ contracts with to provide healthcare in the jail) examined Griffith and determined that his emotional state had stabilized and that he no longer appeared to be a suicide risk.

Later on November 9th, Sabina Trivette, another SHP licensed practical nurse, examined Griffith.  He reiterated his complaints of vomiting and also noted that he was experiencing diarrhea.  Trivette determined that his appearance did not suggest that he was suffering from drug withdrawal.  She treated his vomiting and diarrhea with Imodium and Mylanta.

Neither nurse sought to determine the cause of Griffith's vomiting, place Griffith on the list to be seen by an advanced practice registered nurse ("APRN"), who came once a week to the facility to review and sign-off on the nurses' charts and treatment plans, or to immediately contact an APRN or the supervising doctor at FCRJ, Dr. Waldridge, to discuss Griffith's case.

The following day, November 10th, Trivette once again examined Griffith but did no more than review hydration information with Griffith and told him to inform staff if his condition changed.  On November 11th, Trivette and Sherrow performed a urinalysis in response to complaints by Griffith of difficulty urinating.  They interpreted the results as indicating an infection.  At that point, Sherrow placed Griffith on a list of patients to be seen by the APRN. Trivette also prescribed Cipro, an antibiotic, for Griffith's speculative infection.  According to Griffith's medical expert, the nurses lacked the authority to prescribe such medications.  (*See* R. 74-6, LaMarre Dep. Tr., PageID # 1515 (explaining that in Kentucky neither a licensed practical nurse (such as Trivette) or a registered nurse (such as Sherrow) may prescribe medications).) And SHP protocol indicates than an APRN or physician should have been contacted before the Cipro was given to Griffith.

On November 14, 2015, Griffith experienced his first seizure.  SHP registered nurse Brittany Mundine examined him and then spoke with Sherrow about how to proceed. Ultimately, Mundine decided to send Griffith back to his cell with instructions to move to the bottom bunk.  She also did not notify an APRN or Dr. Waldridge about the seizure.  Less than

three hours later, Griffith suffered a second seizure.  At that point Mundine sent Griffith to a local emergency room, where he experienced a third seizure.  He was subsequently airlifted to the University of Kentucky ("UK") Hospital, to be treated in the intensive care unit.

He remained in the hospital until November 22, 2015, and was diagnosed with acute renal failure, seizure disorder, posterior reversible encephalopathy syndrome ("PRES"), hypomagnesemia, and anion gap metabolic acidosis.  The UK records indicate that his seizures were likely caused by PRES, which in turn was likely caused by his acute renal failure or intoxication.  Moreover, "extensive infectious workup" to determine the cause of his seizure was "negative."   (R. 69-33, UK Discharge Summary, PageID # 830.)   Although Griffith has recovered from his seizures, he remains prone to headaches, fatigue, dehydration, and kidney failure.

Griffith initiated this lawsuit under 42 U.S.C. § 1983, against Franklin County, Jailer Rick Rogers (who oversees FCRJ), and several Franklin County officials (the "Franklin County Defendants"), SHP, Dr. Ronald Waldridge, Jane Bartram (one of the APRN's assigned to FCRJ), and the three nurses who treated Griffith:  Heather Sherrow, Sabina Trivette, and Brittany Mundine.  He alleged that the various Defendants were deliberately indifferent to his objective medical needs, in violation of his due process rights.  He also claimed that the individually named medical providers and SHP were negligent and grossly negligent in rendering care.

All Defendants moved for summary judgment and Nurse Mundine and the Franklin County Defendants asserted that Griffith's claims against them were barred by the doctrine of qualified immunity.  The district court granted summary judgment for all Defendants and dismissed the state law claims without prejudice.  Griffith timely appealed the district court's order, and the Defendants filed timely cross-appeals with respect to the district court's adoption of a wholly objective standard for deliberate indifference.

**DISCUSSION**

We review the district court's order granting summary judgment *de novo*.  *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997).  To be entitled to summary judgment, the movant must have demonstrated that there was no genuine dispute as to any material fact and

that the movant was entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in her favor. *See Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Importantly, a court must not "weigh the evidence and determine the truth of the matter" in deciding a motion for summary judgment. *Anderson*, 477 U.S. at 249.

## 1. Standard for Deliberate Indifference

Both prisoners and pretrial detainees may sue jail officials and medical providers for deliberate indifference to their serious medical needs. Prisoners rely on the Eight Amendment, while pretrial detainees allege their claims under the Fourteenth Amendment. *Compare Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment" (citation omitted)), *with Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) ("Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment.").

Our current test for deliberate indifference under the Fourteenth Amendment mirrors similar claims brought under the Eighth Amendment and contains an objective and subjective component. The objective component requires that the deprivation of medical treatment be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *accord Farmer v. Brennan*, 511 U.S. 825, 834 (1994). We have held that a "sufficiently serious" medical need is a medical condition that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

The subjective component requires a prisoner to demonstrate that prison officials had a "sufficiently culpable state of mind" in denying them medical care. *Wilson*, 501 U.S. at 297.

An official must have known of and disregarded "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The plaintiff must demonstrate that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must [have] also draw[n] the inference." *Id.*

Recent Supreme Court precedent, however, demands that our standard governing Fourteenth Amendment deliberate indifference claims must be altered. In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court examined the standard applicable to an excessive force claim brought under the Fourteenth Amendment by pretrial detainees. Relevant to the present case is the Court's examination of "the defendant's state of mind with respect to the proper *interpretation* of the force . . . that the defendant deliberately (not accidentally or negligently) used." *Id.* at 396 (emphasis in original). This refers to whether the officer subjectively thought they were using excessive force. The Court held that "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. Thus, regardless of whether the officer thought they were using excessive force, if they objectively were, then the claim against them may proceed.

The Supreme Court did not explicitly indicate in *Kingsley* whether this objective test applies in other Fourteenth Amendment contexts, such as deliberate indifference to a pretrial detainee's serious medical needs. We have repeatedly avoided the issue. *See Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6ᵗʰ Cir. 2018) (observing that "[t]his Court has not yet considered whether *Kingsley* . . . abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim"); *Martin v. Warren County*, 799 F. App'x 329, 337 n.4 (6th Cir. 2020) (reserving the "*Kingsley* question for another day" because the plaintiff's underlying claim was meritless).

I would hold that *Kingsley* is applicable to the deliberate indifference context. Subjectivity has no place in a Fourteenth Amendment deliberate indifference claim because pretrial detainees are in a categorically different situation than convicted prisoners. Deliberate indifference claims brought under the Eighth Amendment require an inquiry into the official's state-of-mind because "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned

as the infliction of punishment." *Farmer*, 511 U.S. at 838. However, *Kingsley* affirmed that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." 576 U.S. at 400.

Moreover, the Supreme Court in *Kingsley* largely relied on its earlier decision in *Bell v. Wolfish*, which held that pretrial detainees may prevail in Fourteenth Amendment challenges to conditions of their confinement even in the absence of an intent to punish, "by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Id.* at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)). The Court held that this is an objective standard and proceeded to adapt it to the context of excessive force. *See id.* at 397–99. This indicates that *Kingsley* simply acknowledged the breadth of a pretrial detainee's Fourteenth Amendment rights and affirmed that an objective inquiry into a defendant's state of mind is the appropriate standard by which to judge a defendant's intentional conduct. *See also Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (applying the objective standard to a pretrial detainee's claim against defendants for deliberate indifference to his serious medical needs); *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (conditions of confinement claim); *Bruno v. City of Schenectady*, 727 F. App'x 717, 720–21 (2d Cir. 2018) (deliberate indifference to serious medical needs); *Miranda v. County of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018) (same as *Bruno*).[1]

The majority acknowledges much of this but declines to give effect to this recent Supreme Court precedent because it would not change the outcome in the present case. Whether or not this is correct, we may not simply ignore Supreme Court precedent. *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (holding that prior published opinions of this Court remain binding on future panels "unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision"). *Kingsley* is an inconsistent decision issued by the Supreme Court, and it requires modification of our Fourteenth Amendment deliberate indifference standard.

---

[1]Although three other circuits have declined to apply *Kingsley* beyond the excessive force context, those decisions are unpersuasive. The Eighth Circuit asserted without analysis that *Kingsley* is limited to excessive force claims, *Whitney v. City of St. Louis,* 887 F.3d 857, 860 n.4 (8th Cir. 2018), while the Fifth and Eleventh Circuits mechanically applied a circuit rule, *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017).

Therefore, I would hold that a pretrial detainee must only prove that a defendant-official acted intentionally to ignore their serious medical need or recklessly failed to act with reasonable care to mitigate the risk that the serious medical need posed to the pretrial detainee, even though a reasonable official in the defendant's position would have known, or should have known, that the serious medical need posed an excessive risk to the pretrial detainee's health or safety.

This change in our law necessitates a slight adjustment to the nomenclature we use in deliberate indifference cases. *Kingsley* had no impact on the "objective" component of a deliberate indifference claim—a pretrial detainee must still prove that their medical need was sufficiently serious. However, the "subjective" component is no longer subjective. I will instead refer to this component as the "*mens rea*" component because it still requires a court to determine whether the defendant acted with a sufficiently culpable state of mind to establish deliberate indifference. To do so, we must examine the recklessness of a defendant from the perspective of a reasonable official.

**2. Griffith's Deliberate Indifference Claim**

Griffith has satisfied the objective component of a deliberate indifference claim because he plainly suffered from a sufficiently serious medical condition in FCRJ. He experienced two seizures, was diagnosed with severe kidney damage, had a third seizure while in the hospital, and was only stabilized after being life-flighted to another hospital. *See Santiago*, 734 F.3d at 590 (holding that a "sufficiently serious" medical need is a medical condition that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" (citing *Harrison*, 539 F.3d at 518)). Griffith's objectively serious medical need was both diagnosed and obvious. However, because Griffith received some treatment in the jail but maintains that his serious medical need was exacerbated by a delay in further treatment—i.e., treatment by an APRN/physician or transportation to a hospital—he needed to present verifying medical evidence. *See id.* Griffith has done so by presenting deposition testimony from an expert, Madeline LaMarre, who has a master's degree in nursing, attesting to the detrimental effect of the delay in his treatment. The majority recognizes these points and correctly holds that the objective prong has been met in this case.

However, the majority mistakenly concludes that Griffith has not met the *mens rea* prong with respect to Nurses Trivette, Sherrow, and Mundine. It holds that regardless of which standard we apply—either our obsolete subjective standard or the objective test in light of *Kingsley*—Griffith cannot prevail because his proof only demonstrates that the nurses were negligent in their care of him. But under the correct, objective standard for deliberate indifference, Griffith has demonstrated several genuine issues of material fact which preclude judgment as a matter of law for the nurses. A reasonable jury could find that each nurse recklessly failed to act with reasonable care to mitigate the risk that Griffith's serious medical need posed to him, even though a reasonable nurse in Defendants' positions would have known, or should have known, that Griffith's serious medical need posed an excessive risk to his health and safety.

### i. Heather Sherrow

The district court found that because Nurse Sherrow monitored Griffith and responded to his complaints, he was not "ignored or recklessly endangered" by her failure to provide more treatment. (R. 118, Dist. Ct. Order, PageID # 4240.) Additionally, his condition "remained relatively stable," in that his vital signs were within normal ranges when evaluated by the nurses, so this is not a case where an escalation in care was required to meet the requirements of the Fourteenth Amendment. (*Id.*)

It is clear that Nurse Sherrow did not entirely ignore Griffith. However, at the summary judgment stage, it cannot be said that as a matter of law that she did not recklessly fail to act to address his serious medical need from the perspective of a reasonable nurse in her position. Griffith has identified genuine issues of material fact which, if resolved in his favor, would permit a reasonable jury to find for him on his deliberate indifference claim.

For example, Sherrow knew the results of Griffith's urinalysis and recognized that he needed an APRN's attention. However, rather than expedite this process, she placed him on the list to be seen the following week. She also did not contact the APRN or Dr. Waldridge for instructions, nor did she transport Griffith to the local hospital for further testing and treatment. This arguably constituted a reckless failure to act because Sherrow was aware of a substantial

risk to Griffith's health but failed to take reasonable steps to address it.  Griffith's medical expert attested that the urinalysis results indicated that he "had large amounts of blood and protein in his urine, which is indicative of kidney injury."  (R. 74-6, LaMarre Dep. Tr., PageID # 1517.) Instead of ensuring that a medical provider with treatment authority, like an APRN or Dr. Waldridge, promptly evaluated Griffith's troubling test result, "the nurses took it upon themselves to treat him for a kidney infection" by prescribing an antibiotic.  (*Id.*)  But "[h]e had no evidence of an infection, for which he was treated," (*Id.*), a finding Griffith's University of Kentucky Hospital records confirm.  LaMarre concluded that Griffith "should have been sent to the hospital no later than [November] 11th when he had the abnormal urinalysis, but the nurses should have contacted a medical provider much sooner than that."  (*Id.* at 1536.)

Sherrow's response to Griffith's objectively alarming urinalysis exemplifies a genuine issue of material fact that should have been settled by a factfinder rather than the district court on a motion for summary judgment.  Sherrow obviously perceived a substantial risk to Griffith's health—she did not object to Trivette's decision to prescribe Cipro and realized Griffith needed to be seen by an APRN.  *See Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994) ("Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.").  However, Sherrow disregarded the manifest risk to Griffith by not promptly contacting a supervising medical provider or sending Griffith to a hospital for further evaluation of his kidney damage and any appropriate treatment.

Under our case law, Sherrow had a duty "to do more than simply provide some treatment to a prisoner who has serious medical needs;" rather, she was obligated to "provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm."  *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001).  In *LeMarbe*, we found that a prisoner had met the subjective component because his doctor was aware of a bile leak in his abdomen that "if not stopped immediately, would expose [the prisoner] to a substantial risk of serious harm; and that [the doctor] disregarded such risk by failing to take the actions he knew were necessary to avoid the potentially serious harm to [the prisoner]."  *Id.* at 440.  Under the objective *mens rea* standard we must apply in the present case, a reasonable jury could find that

Sherrow failed to take actions she should have known were required to safeguard Griffith.**2** She could have expedited his evaluation by the APRN, contacted the APRN or Dr. Waldridge directly, or exercised her own discretion to transport Griffith to a local hospital. Sherrow testified in her deposition that she had previously contacted the APRNs assigned to FCRJ with medical questions and stated that she and Trivette could contact a physician or the APRN's prior to their weekly rounds if "there's something we need to call them on." (R. 75-5, Sherrow Dep. Tr., PageID # 2049.) Additionally, according to SHP's internal policies, medical service providers "do not need a physician's order to send patient to the local emergency room (ER) if the patient is in a life-threatening situation." (R. 92, SHP Policies, PageID # 3557.)

LaMarre's testimony substantiates Griffith's dispute as to whether a reasonable nurse would have known that Griffith's urinalysis necessitated hospitalization, or at least evaluation by a medical provider with a wider scope of practice, and whether a reasonable nurse would have known that the risk was sufficiently great to Griffith's health that such actions were necessary. (*See* R. 74-6, LaMarre Dep. Tr., PageID # 1536 (stating that Griffith "should have been sent to the hospital no later than the 11th when he had the abnormal urinalysis, but the nurses should have contacted a medical provider much sooner than that").)

The majority both ignores the context of Sherrow's decision to not contact an APRN or physician after Griffith's urinalysis, and it minimizes the probative value of Griffith's expert evidence.**3** Instead, it focuses on the initial days of Griffith's treatment and finds that Sherrow's failure to place Griffith under medical observation or activate the jail's detox protocol because of

---

**2**The majority attempts to distinguish *LeMarbe* by mischaracterizing the results of Griffith's urinalysis as indicating a "potential abnormality" that did not pose an obvious risk of harm. *See* Majority at 24. LaMarre's testimony provides that the urinalysis "showed he had large amounts of blood and protein in his urine, which is indicative of kidney injury." (R. 74-6, LaMarre Dep. Tr., PageID # 1517.) The results of the urinalysis coupled with Griffith's constant vomiting "should have sent off red flags" to Sherrow of a substantial risk of serious harm to Griffith if she failed to take necessary actions. (*Id.*)

**3**The majority improperly gives importance to Griffith's limited efforts to self-advocate regarding his need for medical treatment and fails to acknowledge the reality of his condition over the relevant time period. *See* Majority at 23 n.9. In the days before Griffith was rushed to the hospital for emergency treatment, Griffith was in dire medical straits, vomiting constantly and coming in and out of consciousness as a result of acute renal failure. He was in no position to request medical treatment or insist that his current treatment was insufficient. Given his condition, Griffith's inability to more vigorously advocate for medical treatment should bear no relevance to whether Sherrow knew or should have known that his urinalysis results necessitated hospitalization or further treatment or whether Sherrow's failure to act was a reckless disregard of a substantial risk of serious harm to him.

his nausea and vomiting was not objectively unreasonable. The majority takes Griffith's medical records in a light much more favorable to Defendants and ignores LaMarre's testimony in finding that failing to call an APRN after the urinalysis results came back did not consciously expose Griffith to an excessive risk of serious harm.

However, Plaintiff has provided verifying medical evidence suggesting that Sherrow's decisions did expose him to an unacceptable level of harm. If indeed Sherrow should have known that Griffith's urinalysis results indicated that he was suffering from kidney damage, whatever the cause, then her failure to contact a physician or transport Griffith to the local emergency room constitutes deliberate indifference to his serious medical needs.[4] Sherrow's decision not to do so arguably evinces a clear apprehension of the substantial risk to Griffith and the reckless disregard thereof. Griffith's eventual seizures and airlift to the UK hospital are a testament to how serious the risk Griffith faced proved to be. A jury should weigh this evidence and determine whether her actions rise to the level of deliberate indifference.

### ii. Sabina Trivette

Nurse Trivette exceeded the scope of her practice and arguably disregarded a substantial risk to Griffith by attempting to treat his kidney ailment on her own. She administered the urinalysis along with Sherrow and decided that all Griffith needed was an antibiotic for a possible infection. This was an incorrect diagnosis and treatment. Trivette asserted that the reason she and Sherrow did not call the APRN after receiving the results was because "we weren't that alarmed by our evaluation." (R. 75-7, Trivette Dep. Tr., PageID # 2316.) However, LaMarre's deposition testimony disputes this assessment. LaMarre stated that the test results indicated kidney damage and the need for hospitalization to properly diagnosis and address his condition. For the reasons applicable to Sherrow, a finder of fact should determine whether Trivette's failure to either contact an APRN or physician or transport Griffith to a hospital also

---

[4]The majority overemphasizes the uncertainty in the record as to what caused Griffith's kidney damage and seizures. Whether they were a result of trauma from being hit by a bat during the botched robbery attempt, dehydration, drug withdrawal, an underlying condition, or a combination thereof, is ultimately irrelevant. What matters—and what Griffith's expert stresses—is that Sherrow was aware of the alarming urinalysis results but failed to take the only proper remedial actions: contacting an APRN or physician immediately or transporting Griffith to a hospital for adequate treatment.

constitutes deliberate indifference.  *See LeMarbe*, 266 F.3d at 439 (holding that prison medical providers must "do more than simply provide some treatment to a prisoner who has serious medical needs," and must "provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm").

### iii.  Brittany Mundine

Nurse Mundine, like the other nurses, failed to contact Dr. Waldridge or an APRN after coming in contact with Griffith.  Instead, she only consulted Nurse Sherrow, who was already failing to properly act.  Mundine also reviewed Griffith's chart after his first seizure and so was fully aware of his worsening symptoms and urine test.  Critically, she saw Griffith after his first seizure—another moment, besides the urinalysis results, when his symptoms significantly escalated and the intervention of a physician was required.  In fact, Mundine violated SHP's seizure protocol by failing to notify a doctor or, at the very least, an APRN after Griffith's first seizure.  The protocol directs a nurse to "[n]otify a physician/provider prior to initiating [the] protocol."  (R. 92, SHP Policies, PageID # 3625.)  While it was perhaps appropriate for Mundine to first treat Griffith's seizure, as she was able to respond immediately, it was a clear violation of this protocol to not contact an APRN or Dr. Waldridge after Griffith stabilized. As Dr. Waldridge himself testified in reference to the nurses' collective failure to contact him after the first seizure occurred, "[i]f I knew, in fact, that they didn't contact the APRNs, and I knew, in fact, that they didn't call me even after initiating the protocol, then that doesn't follow the protocol."  (R. 75-2, Waldridge Dep. Tr., PageID # 1704.)  That is precisely what occurred.

The failure to comply with a prison policy is not a "per se constitutional violation," *Winkler v. Madison County*, 893 F.3d 877, 892–93 (6th Cir. 2018) (quoting *Meier v. County of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010)).  However, it is relevant to assessing whether the official was aware of facts from which an inference of a sufficiently serious medical need could be drawn and whether the official drew that inference.  *See Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (holding that the defendants' failure to "comply with stated jail policy" supported the conclusion that plaintiff had "submitted sufficient evidence for a jury to conclude that the [defendants] were aware of facts from which the inference could be drawn that a sufficiently serious medical need existed, and that they drew that inference").

Under the objective *mens rea* test, this means that the failure to follow a jail policy is relevant to whether a reasonable official would have recognized the risk to the plaintiff.

In the present case, Mundine personally treated Griffith after his first seizure, and SHP protocol establishes a duty on the part of providers to involve a physician in the treatment of a patient after a seizure. The fact that the protocol requires a physician's involvement after a patient suffers a seizure indicates how serious a medical need a seizure is. Mundine's failure to heed this clear directive is evidence that a reasonable jury could rely upon to find that she was aware of a substantial risk to Griffith's health and recklessly failed to act to address that risk.

Additionally, notwithstanding Mundine's failure to follow internal procedures, LaMarre testified that Mundine "should have notified a physician" after the seizure, and, because Griffith had "grossly abnormal" vital signs after the incident and because he did not have a history of seizures, the incident "is a big red flag and should have warranted, with the abnormal vital signs, being sent immediately to the hospital." (R. 74-6, LaMarre Dep. Tr., PageID # 1519; *see also id.* at 1528 (LaMarre states that "[a] new onset seizure is" always a medical emergency which requires hospitalization.).) The weight to be assigned to Mundine's failure to follow the protocol and to LaMarre's testimony is a question best reserved for a finder of fact. *See Anderson*, 477 U.S. at 249 (holding that a court may not "weigh the evidence and determine the truth of the matter" in deciding a motion for summary judgment).

### iv.  Remaining Reasons for Summary Judgment

The district court provided two other reasons for granting summary judgment to the nurses collectively that must be addressed. First, it suggested that Griffith's failure to advocate for himself undermines his claim that his medical providers were deliberately indifferent by not rendering more treatment than they did. The court compared Griffith to the plaintiff in *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001). This comparison is inapt. In *Napier* we considered whether the objective prong was met where the plaintiff alleged deliberate indifference against jail officials who prevented him from receiving a scheduled dialysis treatment. *Id.* at 742. However, because the plaintiff could have received dialysis a short time after his scheduled appointment, did not seek dialysis after being released from detention, and he

presented no medical evidence of the detrimental effect of the delay in his treatment, he could not meet the objective prong. *Id.* at 742–43. Additionally, the plaintiff himself told prison officials that missing his scheduled dialysis treatment would be "no big deal" because he had previously missed them. *Id.* at 741. Medical records showed that he had missed forty-one scheduled dialysis appointments in the previous year. *Id.* We then expressly declined to reach the subjective prong because the objective component was not met. *Id.* at 743.

Even if *Napier* has any relevance to the *mens rea* prong, the present case is entirely distinct. Unlike the plaintiff in *Napier*, Griffith was not suffering from a long-term condition that he was aware of and was regularly treated for. We recognized in *Napier* that such familiarity with one's condition and express admission that not being treated was "no big deal" undermines a deliberate indifference claim when that treatment is withheld. *See id.* at 741–43. Conversely, nothing in the record in the present case suggests that Griffith could have, or should have, understood his urinalysis results or what they portended. The nurses do not contend that they carefully explained the meaning of the test to Griffith, the possible ailments he was suffering from, or the possible causes of his days-long vomiting spell. Perhaps if they had then we could discern some significance from Griffith's failure to self-advocate. Instead, Griffith was at the mercy of the prison staff. After being on suicide watch for two days and vomiting for much of that time, Griffith was in a categorically different position than the plaintiff in *Napier*. Therefore, his failure to self-advocate does not undermine the genuine issues of material fact regarding the nurses' alleged deliberate indifference to his serious medical needs.

Additionally, the district court found that Griffith "failed to show a causal link necessary for his claim to succeed." (R. 118, Dist. Ct. Order, PageID # 4241.) The court stated that "Griffith points to no test which if performed would have prevented the harm. . . . Even with his seizure, Griffith does not put forward medically verifying evidence that the delay induced any harm." (*Id.*) But LaMarre's deposition testimony provides evidence for the opposing view: that the nurses' failure to transport Griffith to a hospital after his urinalysis or his first seizure did induce greater harm. It was only after intensive care at the UK hospital that his condition stabilized. LaMarre stated that while she would not opine as to the cause of the seizures, "he was allowed to deteriorate until he developed seizures when he should have been sent to the hospital

or been evaluated by a doctor or nurse practitioner well before the 14th of November." (R. 74-6, LaMarre Dep. Tr., PageID # 1521.) A reasonable jury could conclude that had he been sent to a hospital, or at least evaluated by an APRN or physician sooner, his condition would not have deteriorated as rapidly or as severely.

Finally, the district court correctly found that the "clearly established" prong of qualified immunity was plainly satisfied in the present case, because "Griffith's right to medical treatment for a serious medical need has been established since at least 1987." (R. 118, Dist. Ct. Order, PageID # 4236 (citing *Phillips v. Roane County*, 534 F.3d 531, 545 (6th Cir. 2008)); *see also Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) ("[I]n 1992, this court explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." (citing *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir. 1992)))).) And we clearly established that a plaintiff can demonstrate a constitutional violation for delayed, rather than denied, treatment with verifying medical evidence at least as early as 2001 when *Napier* so held. 238 F.3d at 742. Consequently, the nurses are not entitled to qualified immunity and Griffith's claims against them should proceed to trial for adjudication by a finder of fact.

### v. Dr. Waldridge

Griffith argues that Dr. Waldridge is liable for the unconstitutional conduct of the nurses under a theory of supervisory liability. The majority finds that Griffith's claim fails because he cannot demonstrate that the nurses engaged in unconstitutional conduct. I would not absolve Waldridge of liability on this basis, at least for purposes of surviving summary judgment. Instead, I would hold that summary judgment was properly granted in favor of Dr. Waldridge because Griffith failed to demonstrate that Waldridge encouraged or participated in the alleged constitutional violation. *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or

knowingly acquiesced in the unconstitutional conduct of the offending officers.'" (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982))).

Griffith argues that because Waldridge abandoned his contractual duties to visit FCRJ at least once a week, he "authorized, approved, or knowingly acquiesced" in his subordinates' failures to follow SHP policy with respect to treating Griffith. (First Br. of Appellant at 42–43.) Although Waldridge's contract with SHP suggests that he was obligated to make weekly visits to the jail, Griffith provides no evidence indicating that Waldridge was aware of or supported his subordinates' failure to follow SHP policy or their decision to not inform him or an APRN of Griffith's condition. While Waldridge certainly should have been more attentive to what was occurring at FCRJ—Griffith's pain and suffering is an object lesson in the consequences of his shortcomings—Plaintiff has not shown the requisite unconstitutional conduct to find that Waldridge was supervisorily liable for the nurses' actions.

Unlike the situation in the sole case that Griffith relies on, *Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995), there were systems in place to prevent what happened to Griffith. In *Taylor* we held that a warden could be liable for the deliberate indifference of his subordinates after he knowingly and lawfully delegated his authority to transfer prisoners to his subordinates, who in turn delegated the transfer authority to lower-ranking officials. *Id.* at 80. This was because the warden testified that he knew that his transfer authority had been delegated to lower-ranking officials without express authorization and that he "had no review procedures" in place to prevent abuse of his transfer authority. *See id.* In this case, SHP's seizure protocol should have led Nurse Mundine to contact Waldridge or an APRN after his first seizure. And Nurses Sherrow and Trivette independently disregarded the seriousness of Griffith's urinalysis, treated him outside the scope of their practice, and failed to alert an APRN or Waldridge as to his deteriorating condition. Thus, there are no similarly deficient delegations of authority or affirmative actions by Waldridge that provide the requisite unconstitutional conduct to hold Waldridge accountable under a theory of supervisory liability.

## CONCLUSION

For the foregoing reasons, I respectfully dissent from the portions of the majority opinion addressed above.  I would adopt an objective test in light of *Kingsley* to assess whether a plaintiff alleging deliberate indifference to their serious medical needs has demonstrated that the defendant acted with the requisite state of mind.  I would then find that Griffith has met this test, at least at the summary judgment stage, with respect to Nurses Sherrow, Trivette, and Mundine.  Accordingly, I would reverse the district court's grant of summary judgment to those Defendants and remand the case to the district court for further proceedings.